**IN THE COURT OF APPEALS OF IOWA**

No. 22-1869
Filed March 8, 2023

**IN THE INTEREST OF H.L., A.L., Z.L., and B.L.,**
**Minor Children,**

**Sh.L., Father,**
        **Appellant,**

**Sc.L., Father,**
        **Appellant.**
_____

Appeal from the Iowa District Court for Cerro Gordo County, Adam D. Sauer, District Associate Judge.

Two fathers appeal from the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Becky Wilson of Becky E. Wilson, Attorney, PLLC, Iowa Falls, for appellant father Sh.L.

Cameron M. Sprecher of Sprecher Law Office, Mason City, for appellant father Sc.L.

Brenna Bird, Attorney General, and Michelle R. Becker, Assistant Attorney General, for appellee State.

Carrie J. Rodriguez, Garner, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

In a series of October 2022 orders, the juvenile court terminated the parental rights of Sc.L. and Sh.L.[1]  Sc.L. is the biological father of three of the four children in this case and the legal father to the fourth, who is Sh.L.'s biological child.  Both fathers separately challenge the grounds for termination, the court's denial of their respective requests for a six-month extension, and the court's decision to not apply the permissive factor allowing it to forgo termination based on finding the strength of each father's bond with his child or children made termination detrimental to them.  Sc.L. also argues termination is not in the children's best interests.  Because we find the State proved the grounds for termination as to both fathers, the barriers to reunification for both fathers would not be remedied in six months, termination of Sc.L.'s parental rights is in the children's best interests, and the bond between the fathers and their children would not make termination of their parental rights detrimental to the children, we affirm.

**I. Background Facts and Prior Proceedings.**

On December 9, 2020, the mother, who is not party to this appeal, prematurely gave birth to twins following an alleged act of domestic violence[2] by her husband, Sc.L., while the three older children were present.  Sc.L. was arrested, and all five of the mother's children were placed in temporary custody of

---

[1] At the time of the termination order, the four children at issue were ages six, three, three, and one year old.  A fifth child died during the pendency of the child-in-need-of-assistance proceedings.

[2] According to the child abuse assessment, Sc.L. allegedly sexually assaulted the mother two days before the physical assault.  The mother had injuries to her lip, neck, arms, legs, and back.  The mother reported that, during the physical assault, her water broke and Sc.L. refused to allow her to seek help.  She eventually managed to leave the home and call for assistance from a neighbor's house.

the mother under the supervision of the Iowa Department of Health and Human Services; the children were adjudicated children in need of assistance (CINA) in January 2021. Tragically, on February 28, one of the twins was found deceased[3] and the four other children were removed from the mother's care; they have remained in foster care for the duration of this case.

In April, one of the children's CINA petition was amended to add a putative father, Sh.L., and subsequent paternity testing confirmed he was that child's biological father, though Sc.L. was the legal father. The mother was the protected party of a no contact order (NCO) with Sh.L. that extended to the child, so Sh.L. moved to be allowed visits; the district court granted the motion in July to allow for supervised visits.

The removal order dictated there should be no contact between the mother and Sc.L., but they regularly violated the order[4] and at various times throughout this child-welfare case the parents moved for it to be removed. In February 2022, the court removed the contact restriction from the permanency order and Sc.L. and the mother were doing semi-supervised visits together, and Sc.L. was participating in anger-management classes as a part of his probation agreement. But in April, he was arrested and charged with domestic abuse assault against the mother.[5]

---

[3] While this two-month-old child was dead on arrival at the hospital, at the same time, the other twin was diagnosed with severe malnutrition and failure to thrive. From what we can gather based on the testimony at the termination trial, apparently none of the professionals involved with the family picked up on these severe health concerns.

[4] Multiple times, after violations of the order, care providers noted bruises on the mother.

[5] At the termination hearing, Sc.L. testified there were four or five domestic abuse incidents in total—including two from 2016 and two during the pendency of this case—and that he and the mother were dissolving their marriage.

A termination hearing took place on September 20 and 27 and October 5, 2022. The juvenile court terminated Sc.L.'s rights to the oldest child under Iowa Code section 232.116(1)(e) and (f) (2022) and to the younger three children under section 232.116(1)(e) and (h). Sh.L.'s rights to his child were terminated under section 232.116(1)(e) and (h).

**II. Analysis.**

Both fathers appeal. We review a termination of parental rights de novo. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). "On appeal, we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence." *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). We address each father's appeal separately.

*A. Sc.L.*

Sc.L. argues the State failed to prove the statutory grounds for termination. He also argues the juvenile court should have avoided termination using the permissive exception found in section 232.116(3)(c).

Sc.L. was still incarcerated at the time of the termination hearing, and the day of his April 2022 arrest was the last in-person visit he had with the children. To his credit, providers at the termination hearing testified he did a good job with the children during his visits while he was available in the community. During his incarceration, he had one video visit with the two older children and sent five letters to the children.[6] But, the June before the termination hearing, he stopped

---

[6] Because there is now an NCO between the mother and Sc.L., which extends to the children, the father overcame a number of hurdles put in place by the prison before he could have contact with the children.

communicating with care providers, instead directing them to speak to his attorney. He was set to appear before the parole board in February 2023, but his discharge date was to be June 2024. He planned to complete an additional anger-management course before his release, yet he reported that therapy was not effective for him. When asked about his plans for housing or employment after being returned to the community, Sc.L. refused to answer because the mother was in the room.

Sc.L. challenges the final elements of 232.116(1)(f) and (h), which both require the State to prove "[t]here is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents."[7] But this challenge fails as Sc.L admitted the children could not be returned to his care at the time of the termination hearing because of his incarceration. Still, he thought with a six-month extension, assuming he was released on parole, he could take over the children's care. *See* Iowa Code §§ 232.117(5), .104(2)(b) (allowing the juvenile court, in its permanency order, to give a parent six additional months to work toward reunification if the juvenile court decides not to terminate parental rights). But, to grant an additional six months, the court must be able to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." *Id.* § 232.104(2)(b). Not only could the district court here not find that the father would

---

[7] Section 232.116(1)(f) relates to children four years of age or older, while paragraph (h) covers children under four years of age or older. In this case, only the oldest child is over four years old.

be released from prison within six months, the father would not reveal his plan to have stable housing—which he struggled with before his incarceration—and employment in that time. Without any clarity about what the next six months would or could look like, we agree with the juvenile court that an additional six months could not be granted. *See D.W.*, 791 N.W.2d at 707 ("We do not 'gamble with the children's future' by asking them to continuously wait for a stable biological parent." (citation omitted)).

Sc.L next argues termination is not in the children's best interests. In this analysis, we "give primary consideration to the [children's] safety, to the best placement for furthering the long-term nurturing and growth of the [children], and to the physical, mental, and emotional condition and needs of the [children]." Iowa Code § 232.116(2). Sc.L. has repeatedly been incarcerated during the duration of this case for violence toward the children's mother, including an incident that caused her to go into premature labor with the youngest child, which he continues to deny. Moreover, at the termination hearing, he testified he saw no reason the domestic violence would impact his children apart from causing the current separation. For their part, as the father recognized, the children are thriving in their current foster placements. And terminating Sc.L.'s parental rights will allow them to achieve permanency. We find termination to be in the children's best interests.

Finally, Sc.L. argues the juvenile court should have relied on a permissive exception to termination found in section 232.116(3)(c), which allows the juvenile court not to terminate if "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." The burden to prove this exception falls to the parent

seeking to avoid termination. *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018). And while we do not doubt that Sc.L. loves his children, he has had limited meaningful contact with them since his incarceration in April 2022. Because he has not shown that they possess a bond so close as to make termination detrimental to the children, we decline to use the permissive exception and affirm termination of his parental rights. *See D.W.*, 791 N.W.2d at 709 (formulating the section 232.116(3)(c) analysis as "center[ing] on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the parent's] inability to provide for [the child's] developing needs").

*B. Sh.L.*

Sh.L. appeals the termination of his parental rights involving his biological child and argues that the State failed to prove the grounds for termination, the juvenile court should have avoided termination due to the close bond he and the child share, and the juvenile court should have granted an additional six months to work toward reunification.

Sh.L. challenges only the final element of Iowa Code section 232.116(e), which allows termination if:

> There is clear and convincing evidence that the parents have not maintained significant and meaningful contact with the child during the previous six consecutive months and have made no reasonable efforts to resume care of the child despite being given the opportunity to do so. For the purposes of this subparagraph, "significant and meaningful contact" includes but is not limited to the affirmative assumption by the parents of the duties encompassed by the role of being a parent. This affirmative duty, in addition to financial obligations, requires continued interest in the child, a genuine effort to complete the responsibilities prescribed in the case permanency plan, a genuine effort to maintain communication with the child, and requires that the parents establish and maintain a place of importance in the child's life.

It is true Sh.L. had stable housing, the child who is involved in this case got along well with Sh.L.'s other children (who are not at issue in this case), and both Sh.L.'s wife and mother testified about his strengths as a parent and the strong support system provided by his extended family. But, in the time between July 2021 when he began visits and the termination hearing, he missed twenty-seven of the fifty-two once-weekly visits offered to him—which is 52% of the interactions, including the weeks leading up to the termination hearing. As far back as the end of 2021, the department informed Sh.L. that inconsistency with visits was an issue and he was required to confirm visits the night before; he testified at trial he missed "a handful" of visits because of illness and family emergencies and others because he simply forgot to confirm. This inconsistency prevented Sh.L. from ever moving past supervised visits with the child. He did not attend any of the child's appointments or activities, interact with the child's therapist, or ever call the child's foster family to check in.[8] Although offered a weekly phone call with the child, he never followed through with that offer. After the court ordered him to complete recommended mental-health treatment, he attended one appointment and then failed to attend any further. As a positive, at the time of the termination hearing, he had two future appointments scheduled. But in the end, Sh.L. has failed to take the affirmative steps necessary to take on the responsibilities of parenting in the year that was critical to proving his ability to caretake.

---

[8] Sh.L. testified he was never asked to attend these events. One of the family centered services providers explained that Sh.L. was given the foster family's information and encouraged to reach out to see about these kinds of events.

Like Sc.L., this father also argues he should have been given more time to work toward reunification. "[O]ur legislature has carefully constructed a time frame to provide a balance between the parent's efforts and the child's long-term best interests." *D.W.*, 791 N.W.2d at 707. And when Sh.L. has not taken advantage of the time he had in the last year to appropriately step up in the child's life, and he can provide no evidence or expected change that would make the next six months any different, we are unable to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period."[9] Iowa Code § 232.104(2)(b); *see also In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable.").

Further, Sh.L. has not established that he and the child share a bond close enough that the juvenile court should have avoided termination using section 232.116(3)(c).[10] There was ample evidence provided by the department's caseworkers that the child has grown accustomed to Sh.L. but that the bond has not developed because of Sh.L.'s inconsistency. As the one carrying the burden to show the exception should have been used, *see A.S.*, 906 N.W.2d at 476, Sh.L.

---

[9] In his appellate brief, Sh.L. argues that he would have been more consistent with visits had there not been a confirmation requirement. But it was his initial inconsistency that led to the requirement in the first place.

[10] Sh.L. makes conclusory statements that this is a best-interests argument, but he speaks only to the statutory exception. We limit our discussion in the same way. *See* Iowa R. App. P. 6.1401—Form 5 (explaining that, as a parent challenging termination, "[g]eneral conclusions, such as the 'the trial court's ruling is not supported by law or facts' are not acceptable"); *see also In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) ("A broad, all encompassing argument is insufficient to identify error in cases of de novo review.").

has not established that the bond is so strong that termination would be detrimental to the child, so we decline to use it. Thus, we affirm termination of Sh.L.'s parental rights.

**III. Conclusion**

Because the State proved the statutory grounds for termination as to both fathers and termination of Sc.L.'s parental rights is in the children's best interests, and because neither father has shown the bond shared between they and the children is strong enough to make termination detrimental, we affirm the juvenile court's termination of the parental rights of each of these fathers.

**AFFIRMED ON BOTH APPEALS.**